436 Mass. 763 (2002)                                                763

Massachusetts Federation of Teachers, AFT, AFL-CIO *v.* Board of Education.

Massachusetts Federation of Teachers, AFT, AFL-CIO, & another[1] *vs.* Board of Education & another.[2]

Suffolk. February 6, 2002. - May 9, 2002.

Present: Marshall, C.J., Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Education Reform Act. Regulation. Administrative Law,* Regulations, Judicial review, Agency's interpretation of statute. *Education,* Teacher testing. *Board of Education. Constitutional Law,* Equal protection of laws, Education. *Due Process of Law,* Vagueness of regulation. *Public Employment,* Collective bargaining.

Discussion of the statutory and regulatory background of the Education Reform Act of 1993 and its stated purpose of improving the education provided to public school students in the Commonwealth. [765-769]

Statement of the deferential standard of review governing a facial challenge to regulations promulgated by a government agency. [771-772]

The Board of Education had the authority pursuant to G. L. c. 69, §§ 1B, 1I, 1J, and G. L. c. 71, § 38G, to promulgate 603 Code Mass. Regs. §§ 2.01, 2.02, 2.05, 44.02, 44.03, 44.04 (2000), regulations that required mathematics teachers in certain public schools to take a Mathematics Content Assessment test to evaluate their mastery of the subject matter prior to renewal of their licenses. [772-776]

The Board of Education did not act in an arbitrary and capricious manner in promulgating regulations that required mathematics teachers in certain public schools to take a Mathematics Content Assessment test to evaluate their mastery of the subject matter prior to renewal of their licenses, where the relevant statutory language clearly authorized the actions taken by the board to reform public education in the Commonwealth. [776-777]

Regulations promulgated by the Board of Education requiring mathematics teachers in certain public schools to take a Mathematics Content Assessment test to evaluate their mastery of the subject matter prior to renewal of their licenses did not violate the equal protection and due process rights of teachers under the Fourteenth Amendment to the United States Constitution and arts. 1 and 10 of the Massachusetts Declaration of Rights, where the regulations were rationally related to the furtherance of a legitimate State interest in providing a high quality public education to every child of the Commonwealth; where the challenged regulations furthered plausible legislative objectives through reasonable means; and where there was no merit to the claim that the challenged regulations were impermissibly vague. [777-781]

[1] Massachusetts Teachers Association/NEA.

[2] Commissioner of Education.

Regulations promulgated by the Board of Education requiring mathematics teachers in certain public schools to take a Mathematics Content Assessment test to evaluate their mastery of the subject matter prior to renewal of their licenses did not conflict with the public sector collective bargaining law, or with provisions of the Education Reform Act of 1993 requiring collective bargaining over teacher performance evaluations, where there was no conflict between the challenged regulations, which governed State teacher certification, and collective bargaining law, which governed specific terms and conditions of employment. [781-783]

CIVIL ACTION commenced in the Superior Court Department on June 30, 2000.

The case was heard by *Patrick J. King,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Jeffrey W. Jacobsen* (*Matthew D. Jones* with him) for the plaintiffs.

*Pierce O. Cray,* Assistant Attorney General, for the defendants.

SPINA, J. The Massachusetts Federation of Teachers and the Massachusetts Teachers Association/NEA (collectively, Teachers) filed a complaint for declaratory and injunctive relief against the Board of Education (board) and the Commissioner of Education (commissioner) (collectively, the defendants) challenging the validity of 603 Code Mass. Regs. §§ 2.01, 2.02, 2.05, 44.02, 44.03, 44.04 (2000), regulations promulgated by the board that require mathematics teachers in certain schools to take a Mathematics Content Assessment test (assessment test) to evaluate their mastery of the subject matter prior to renewal of their licenses. A Superior Court judge denied the defendants' motion to dismiss the complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), but declared the challenged regulations valid. The Teachers filed a timely notice of appeal, and we granted the defendants' application for direct appellate review. The issues now before us are whether (1) the board had the authority to promulgate the regulations; (2) the regulations are arbitrary and capricious; (3) the regulations, on their face, violate the Teachers' due process and equal protection rights; (4) the regulations conflict with collective bargaining laws; and (5) the Teachers should have been afforded the opportunity to develop a factual record. We affirm the judgment of the Superior Court.

1. *Statutory and regulatory background.* On June 18, 1993, the Governor signed into law the Education Reform Act of 1993 (Act), St. 1993, c. 71,[3] a comprehensive statutory scheme addressing, among other things, student performance, school and district performance, certification and recertification of teachers, and professional development. "[T]he purpose of the [Act], from its billions of dollars in additional financial aid to local school systems, to its establishment of teacher performance standards, [was] to improve the education provided to the students in the classrooms of our public schools." *School Dist. of Beverly* v. *Geller,* 435 Mass. 223, 235 (2001).

An important focus of the Act is the accountability of teachers, schools, and school districts for student performance. See G. L. c. 69, § 1B, twenty-first par. ("The board shall carry out its responsibilities with a view toward increasing the accountability and effectiveness of public early childhood, elementary, secondary and vocational-technical schools and school districts for the performance of the students they serve"). See also G. L. c. 69, §§ 1I, 1J, 1K (school and district accountability); G. L. c. 71, § 38 (teacher accountability). General Laws c. 69, § 1I, first par., provides that the board "shall adopt a system for evaluating on an annual basis the performance of both public school districts and individual public schools." That system "shall be designed both to measure outcomes and results regarding student performance, and to improve the effectiveness of curriculum and instruction." G. L. c. 69, § 1I, second par. The Massachusetts Comprehensive Assessment System (MCAS) was adopted by the board for Statewide assessment of individual students' academic performance. See 603 Code Mass. Regs. §§ 30.00 (2000).

---

[3] The Education Reform Act of 1993 (Act), St. 1993, c. 71, made significant changes to the governing structure and financing of the Massachusetts public school systems. These changes were enacted to ensure "(1) that each public school classroom provided the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their sense of security or self-esteem, (2) a consistent commitment of resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational performance goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement." G. L. c. 69, § 1, as appearing in St. 1993, c. 71, § 27.

The board has broad authority to establish such policies as are necessary to fulfil the purposes of the Act and to promulgate regulations that encourage innovation, flexibility, and accountability in schools and school districts. See G. L. c. 69, § 1B, twenty-third par. Pursuant to G. L. c. 69, § 1J, first par., "[t]he board shall establish regulations defining when a school or school district has chronically failed to improve the educational program provided to students served by the school or district." Schools where the academic performance of students does not improve will be deemed under-performing or chronically under-performing and will become subject to remedial measures. See G. L. c. 69, § 1J. See also G. L. c. 69, § 1B, tenth par. ("The board shall establish the process and standards for declaring a school or school district to be 'under-performing' or 'chronically under-performing' in accordance with the provisions of this chapter").

Pursuant to its broad statutory authority in this area of school accountability, the board promulgated detailed regulations, 603 Code Mass. Regs. §§ 2.00, for reviewing "the adequacy of the educational opportunities and services provided by the Commonwealth's public schools" and for identifying "the circumstances under which the [b]oard may declare a school or school district chronically under-performing and intervene."[4] 603 Code

---

[4]Pursuant to 603 Code Mass. Regs. § 2.03 (1), "[t]he [b]oard shall adopt, and the Department [of Education] shall implement, a School Performance Rating Process to track the performance and improvement demonstrated by Massachusetts public schools on State assessments in core academic subjects." Schools that fail to meet their assigned "improvement expectations" at the conclusion of each two-year rating cycle "may be referred for review to determine whether the school is under-performing"; priority is given to the review of schools with the highest percentage of students performing at the "failing" and "needs improvement" levels of the MCAS tests. See 603 Code Mass. Regs. § 2.03(4). A review panel will then analyze and evaluate a wide range of documents submitted by the school to the Department of Education. See 603 Code Mass. Regs. § 2.03(4)(a)-(c). The commissioner will consider the review panel's assessment of the school and will decide whether to declare the school under-performing or to give the school an academic warning until the end of the next rating cycle. See 603 Code Mass. Regs. § 2.03(4)(d), (e). Once a school is deemed under-performing, an independent fact-finding team is appointed to conduct a comprehensive on-site inspection of the school, 603 Code Mass. Regs. § 2.03(5), and the district in which the school is located must submit, within six months, an improvement plan to the board for its

Mass. Regs. § 2.01(2). These regulations "also govern[] the [b]oard's review of the mathematics programs provided by the Commonwealth's public schools and identif[y] circumstances under which the [b]oard may declare a school's mathematics program low-performing and require mathematics teachers in that program to take a diagnostic mathematics content assessment." *Id.* In particular, math teachers at schools with "low-performing mathematics programs,"[5] math teachers in middle or high schools that have been referred for review under 603 Code Mass. Regs. § 2.03(7), and math teachers who are not certified in mathematics and are teaching in a middle or high school with a 30% or greater failure rate on the 1999 mathematics MCAS (with certain limited exceptions), must take the assessment test.[6] See 603 Code Mass. Regs. § 2.05(2). A math teacher is required to take it only once. *Id.* Results on the assessment test are to be used for diagnostic purposes in developing or revising individual professional development plans (professional development plans), which are an integral

---

approval. 603 Code Mass. Regs. § 2.03(6). See G. L. c. 69, § 1J. "If an under-performing school fails to demonstrate significant improvement in student performance within 24 months after approval of a remedial plan by the [b]oard, the [b]oard may declare the school to be chronically under-performing." 603 Code Mass. Regs. § 2.03(8). See G. L. c. 69, § 1J. "Upon declaration by the [b]oard that a school is chronically under-performing, the [b]oard shall intervene in accordance with [G. L. c. 69, § 1J], and shall issue a written order specifying actions which the school district shall take to improve the academic performance of students at the school." 603 Code Mass. Regs. § 2.03(9).

[5]"Any middle or high school in which 30% or more of the students fail the MCAS mathematics test, excluding those students who are enrolled in special education, who are classified as having limited English proficiency, or who have not been enrolled in the school for at least two years, and which failed to meet or exceed its improvement expectations on the MCAS mathematics test, as established through the School Performance Rating Process, shall be considered to have a Low-Performing Mathematics Program." 603 Code Mass. Regs. § 2.05(1).

[6]The commissioner shall decide whether any school with a low-performing mathematics program should be referred for review to determine whether it is under-performing. See 603 Code Mass. Regs. § 2.05(4). "In making this determination, the [c]ommissioner shall consider the participation rates and performance of the school's mathematics teachers on the Mathematics Content Assessment, among other factors." *Id.*

component of the process for renewal of a teaching license.[7] See 603 Code Mass. Regs. § 2.05(3).

Individuals employed in Massachusetts public schools as teachers, or other enumerated professionals, must hold a license (also referred to as a "[s]tandard educator certificate") granted by the commissioner. See G. L. c. 71, § 38G, tenth and twenty-ninth pars. "The commissioner of education shall have the authority to grant, upon application . . . standard educator certificates to persons who have satisfied the requirements for such certificates as established by the board. The board shall define the knowledge of subject matter and demonstration of competencies commensurate with attainment and renewal of such certificates." G. L. c. 71, § 38G, eleventh par. See G. L. c. 69, § 1B, third par. (board shall establish standards for certifying public school teachers as set forth in G. L. c. 71, § 38G). A teaching license is valid for five years and must be renewed every five years thereafter.[8] See G. L. c. 71, § 38G, tenth par. Renewal occurs "upon the successful completion of an individual professional development plan that meets the subject matter knowledge and teaching skill requirements set by the board. Such plan shall be designed to increase the [educator's] ability . . . to improve student learning." G. L. c. 71, § 38G, twenty-second par. In essence, the Act holds teachers accountable for the academic performance of their students. "The board shall have the authority to promulgate, amend and rescind such rules and regulations as may be necessary to carry out the provisions of this section." G. L. c. 71, § 38G, twenty-sixth par.

---

[7]We note that although math teachers in schools with low-performing mathematics programs must take the assessment test in order to maintain their certification, the regulations do not require that such teachers pass it. That being the case, the regulations do not dictate employment consequences because substandard results can be remediated through continuing professional development prior to recertification.

[8]All teaching licenses granted prior to October 1, 1994, are subject to renewal every five years. See G. L. c. 71, § 38G, twenty-third par. "Teachers who were authorized, permitted or approved to teach in a subject or area for which there was no certification standard before [September 1, 1982,] shall acquire and maintain the development of the skills and training required of persons certified to teach in said subject or areas after that date." G. L. c. 71, § 38G, fortieth par.

Pursuant to its broad statutory authority in this area of teacher accountability, the board promulgated detailed regulations, 603 Code Mass. Regs. §§ 44.00, to carry out the recertification provisions of the Act. The purpose of the Massachusetts recertification system is to "enhance education through ongoing professional development for educators that meets high standards for quality . . . in order to assist students in meeting state learning standards." 603 Code Mass. Regs. § 44.01. In accordance with G. L. c. 71, § 38G, licensed public school teachers must have their proposed professional development plans approved by their supervisors pursuant to specific timelines. See 603 Code Mass. Regs. § 44.04(1). The plan of any math teacher in a low-performing mathematics program will not be approved or endorsed by a supervisor until that teacher takes the assessment test. See 603 Code Mass. Regs. § 44.04(4)(a). In evaluating whether a professional development plan is "consistent with the educational needs of the school and/or district and whether the plan is designed to enhance the ability of the educator to improve student learning," a supervisor must determine that the plan addresses weaknesses identified by the assessment test. 603 Code Mass. Regs. § 44.04(4)(b). By addressing any such weaknesses, the board can remediate math teacher deficiencies so as to achieve the ultimate goal of maximizing the academic performance of all students.

2. *Procedural background.* In their six-count complaint brought pursuant to G. L. c. 30A, § 7, and G. L. c. 231A, the Teachers challenged the regulations relating to the mandatory assessment of mathematics teachers in certain schools, 603 Code Mass. Regs. §§ 2.01, 2.02, 2.05, 44.02, 44.03, 44.04, as facially invalid.[9] Count I alleged that the regulations conflicted with their enabling legislation as set forth in G. L. c. 69, §§ 1B, 1I, 1J, 1K, and with G. L. c. 71, § 38G. Count II alleged that the regulations were ultra vires because they exceeded the board's statutory authority. Count III alleged due process violations in that there was no rational basis for the existence of the

---

[9]The Teachers' challenges to the regulations are facial rather than "as applied" because, as they acknowledge, the board has not yet announced the final form of the assessment test, scheduled a date for its initial administration, or specified which teachers will be required to take it.

regulations, and they unconstitutionally deprived teachers of property (their State-conferred teaching licenses) without setting forth concrete standards for the testing requirements, the waiver of such requirements, and the procedures for appeals. Count IV alleged equal protection violations in that the standards governing the identification of teachers subject to testing had no rational basis and could not be applied consistently. Count V alleged that the regulations conflicted with the public sector collective bargaining law, G. L. c. 150E, and with G. L. c. 71, §§ 38, 38G, 38Q. Count VI alleged that the regulations were an arbitrary and capricious exercise of the board's authority. The Teachers sought a declaratory judgment that the regulations were unconstitutional and invalid insofar as they established a new category of "low-performing mathematics programs" and required designated teachers to take the assessment test. They also asked that the board be permanently enjoined from requiring teachers to take any assessment test, either as a condition of continued employment or as a prerequisite to license renewal, or from otherwise enforcing the relevant provisions of 603 Code Mass. Regs. §§ 2.05, 44.03, 44.04.

The defendants filed a motion to dismiss the Teachers' complaint pursuant to rule 12 (b) (6), asserting that the regulations were well within the board's broad statutory authority to hold schools accountable for the performance of their students and to recertify teachers. A Superior Court judge denied the defendants' motion to dismiss but entered a judgment declaring that (1) the board had the authority, pursuant to G. L. c. 69, §§ 1B, 1J, and G. L. c. 71, §§ 38, 38G, to promulgate the challenged regulations; and (2) the regulations, on their face, did not violate the Teachers' due process or equal protection rights, did not conflict with collective bargaining laws, were not arbitrary and capricious, and were otherwise constitutionally sound.[10] He concluded that the board had used the authority and flexibility granted to it under the Act to adopt regulations that

[10]The judge noted that, when a party brings a declaratory judgment action, a judge should not allow a motion to dismiss where the pleadings show an actual controversy. See *Nelson* v. *Commissioner of Correction*, 390 Mass. 379, 387-388 (1983); *Pina* v. *Liberty Mut. Ins. Co.*, 388 Mass. 1001, 1002 (1983). Rather, the judge should declare the rights of the parties. See *Attorney Gen.* v. *Kenco Optics, Inc.*, 369 Mass. 412, 418 (1976). The judge opined that, in this

were rationally related to legitimate State interests, namely ensuring that math teachers are knowledgeable in the subject matter they teach and remediating any identified weaknesses so as to improve the education provided to all students. We now consider the validity of the challenged regulations.

3. *Standard of review.* A highly deferential standard of review governs a facial challenge to regulations promulgated by a government agency. See *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764, 769 (1996). A properly promulgated regulation "has the force of law . . . and must be accorded all the deference due to a statute." *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983). A party challenging the validity of a regulation must prove "that the regulation is illegal, arbitrary, or capricious." *Id.* at 722. Such plaintiff must establish "the absence of any conceivable grounds upon which [the rule] may be upheld." *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776 (1980), quoting *Colella* v. *State Racing Comm'n*, 360 Mass. 152, 156 (1971). "That burden cannot be carried 'by arguing that the record does not affirmatively show facts which support the regulation.' " *Dowell* v. *Commissioner of Transitional Assistance*, 424 Mass. 610, 612 (1997), quoting *Purity Supreme, Inc.* v. *Attorney Gen., supra.* Rather, "we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). See *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595-596 (1992) (only regulation plainly in excess of legislative power should not be enforced). However, "a regulation that is irreconcilable with an agency's enabling

case, an actual controversy existed over whether the board had the authority to promulgate regulations pertaining to the assessment of certain mathematics teachers. He stated that the case did not present any factual questions. Because the judge determined that the board had the authority to issue the challenged regulations and that all of the Teachers' claims failed as a matter of law, he concluded that the appropriate disposition was to deny the defendants' motion to dismiss and declare the rights of the parties.

legislation cannot stand." *Quincy* v. *Massachusetts Water Resources Auth.*, 421 Mass. 463, 468 (1995).

In reviewing a regulation, a court cannot "substitute [its] judgment as to the need for a regulation, or the propriety of the means chosen to implement the statutory goals, for that of the agency, so long as the regulation is rationally related to those goals." *American Family Life Assur. Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983). "It is not our function to consider the expediency of an enactment or the wisdom of its provisions." *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 544 (1974). See *Worcester Sand & Gravel Co.* v. *Board of Fire Prevention Regulations*, 400 Mass. 464, 467 (1987) (where question whether any conceivable ground exists to uphold regulation is fairly debatable, court cannot substitute its judgment for that of agency).

This deferential approach "is necessary to maintain the separation between the powers of the Legislature and administrative agencies and the powers of the judiciary." *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 723. Plenary review of administrative regulations "would have an unhealthy tendency to substitute the court for the agency as policymaker." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 491 (1973). Administrative agencies possess expertise in their areas of specialization, and "[r]egulations are good indicators of an agency's interpretation of a statute it is charged with administering." *American Family Life Assur. Co.* v. *Commissioner of Ins., supra* at 475. Judicial deference "also precludes the possibility that a plaintiff may frustrate administrative policy merely by amassing facts, statistics, and testimony before a judge, all of which may have little or nothing to do with the legislative facts which the administrative agency relied upon in making its regulation." *Borden, Inc.* v. *Commissioner of Pub. Health, supra* at 723. "[R]espect for the legislative process means that it is not the province of the court to sit and weigh conflicting evidence supporting or opposing a legislative enactment." *Id.*, quoting *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 687 (1981).

4. *Regulations as conflicting with enabling legislation and as ultra vires.* The Teachers acknowledge that the Act is a detailed

statutory scheme for addressing district, school, and teacher accountability for student academic performance. However, they contend that the challenged regulations conflict with the Act and that their promulgation by the board was ultra vires. The Teachers argue that the Legislature never intended to create a category of "low-performing mathematics programs," identified by poor student performance on one subject of the MCAS, whose teachers would be subjected to board oversight and required to take the assessment test. They also assert that this process for addressing educational deficiencies conflicts with the Act's provisions for appointment of an independent fact-finding team, see G. L. c. 69, § 1J, second par., to assess the reasons for student under-performance and the prospects for improvement. The Teachers contend that teacher competency in individual schools is a matter properly left to the authority of local school districts, not the board. Moreover, they point out that there is no authority in G. L. c. 71, § 38G, for linking teacher recertification to student performance or the taking of the assessment test.

Contrary to the Teachers' arguments, promulgation of the challenged regulations was entirely within the board's authority, and the regulations are fully consistent with the Act's accountability provisions which they are specifically designed to implement. An administrative agency has the authority to promulgate regulations giving effect to legislative mandates. See *Thomas* v. *Commissioner of the Div. of Med. Assistance*, 425 Mass. 738, 746 (1997), and cases cited. However, the agency may not exceed those powers and obligations expressly conferred on it by statute or reasonably necessary to carry out the purposes for which the statute was enacted. See *Telles* v. *Commissioner of Ins.*, 410 Mass. 560, 564-565 (1991); *Saccone* v. *State Ethics Comm'n*, 395 Mass. 326, 335 (1985). "An agency's powers to promulgate regulations 'are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words.' " *Purity Supreme, Inc.* v. *Attorney Gen., supra* at 770, quoting *Commonwealth* v. *Cerveny*, 373 Mass. 345, 354 (1977). See *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 (1979) (authority for regulation need not be pinpointed to specific statutory

language). "When the Legislature delegates to an administrative agency a broad grant of authority to implement a program of reform or social welfare, the administrative agency generally has a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation." *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 525 (1979). Where the focus of a statutory enactment is reform, the administrative agency charged with its implementation should construe it broadly so as to further the goals of such reform. *Id.* Contrast *Board of Educ.* v. *School Comm. of Quincy*, 415 Mass. 240, 245-246 (1993) (Legislature did not invest board with statutory authority to require local school committee to provide alternative educational services for properly expelled child).

As its name clearly suggests, the Legislature promulgated the Act to reform public education in this Commonwealth by "establishing and achieving specific educational performance goals for every child" and by "holding educators accountable for their achievement." G. L. c. 69, § 1. In accordance with these stated objectives, the Legislature gave the board broad authority to, among other things, establish policies pertaining to the education of public school students, see G. L. c. 69, § 1B, first par.; increase the accountability of public schools for student performance, see G. L. c. 69, § 1B, twenty-first par.; establish the criteria for designating a school as under-performing, see G. L. c. 69, § 1B, tenth par.; establish the standards for certifying public school teachers in accordance with G. L. c. 71, § 38G, see G. L. c. 69, § 1B, third par.; adopt a system to evaluate schools on an annual basis that would be designed to improve the efficacy of instruction and curriculum, see G. L. c. 69, § 1I, first, second pars.; and promulgate regulations as necessary to fulfil the purposes of G. L. c. 69, see G. L. c. 69, § 1B, twenty-third par. The Legislature also gave the board the authority to set "subject matter knowledge and teaching skill requirements" for inclusion in teacher professional development plans, the successful completion of which is a condition for license renewal. See G. L. c. 71, § 38G, twenty-second par. Pursuant to its statutorily delegated powers, the board used its rule making authority and flexibility to mandate the assessment of teacher competency in mathematics and the

remediation of identified weaknesses in an effort to achieve high quality public education for every child. The challenged regulations are thus "reasonably related to the purposes of the enabling legislation." *Consolidated Cigar Corp.* v. *Department of Pub. Health, supra* at 855, quoting *Mourning* v. *Family Publ. Serv. Inc.*, 411 U.S. 356, 359 (1973). The assessment of teacher knowledge and subject matter proficiency is a critical and integral component of the board's ability to satisfy the Legislature's mandate. As such, the promulgation of the regulations was a valid exercise of the board's authority.[11]

The categorization of "low-performing mathematics programs" is a specific identifying tool to assist the commissioner in determining whether individual schools may be under-performing and reflects a policy decision to focus on a perceived area of particular academic weakness. Contrary to the Teachers' arguments, the designation of low-performing mathematics programs and the requirement that math teachers in schools with such programs take the assessment test does not infringe on the role of the "Independent Fact-Finding Team." See 603 Code Mass. Regs. § 2.02. Its role is to conduct a comprehensive on-site inspection of the school for detailed assessment and re-mediation purposes *after* the school has been declared to be under-performing. See 603 Code Mass. Regs. § 2.03(5). The assessment test, by contrast, is merely one factor that shall be considered by the commissioner when initially evaluating whether a school with a low-performing mathematics program should be referred for review to determine if it is under-performing. See 603 Code Mass. Regs. § 2.05(4).

The assessment test is a wholly reasonable exercise of the

[11]In 1998 and 1999, Governor Argeo Paul Cellucci proposed legislation that would have mandated, as a prerequisite to recertification, that all currently employed and licensed teachers take and pass the same test required of new teachers. The Legislature declined to enact such legislation, and the Teachers contend that this evinces an intent not to test teachers who are already work-ing in the public schools. However, no inference is possible from this negative history. "The fallacy in th[e] argument is that no one knows why the legislature did not pass the proposed measure[] . . . . The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation." *Franklin* v. *Albert*, 381 Mass. 611, 615-616 (1980), quoting *Berry* v. *Branner*, 245 Or. 307, 311 (1966).

776                            436 Mass. 763 (2002)

Massachusetts Federation of Teachers, AFT, AFL-CIO *v*. Board of Education.

board's broad statutory authority over professional development and recertification. Both the school district as employer and the Commonwealth as licensor have an interest in ensuring teacher competency. The Teachers' reading of the Act would divest the board of authority over teacher accountability for student performance, thereby increasing the likelihood that the Act's goals of educational reform would not be fully achieved. The focus of the Act on under-performing schools, and particularly low-performing mathematics programs, means that the board can implement a flexible approach to educational reform that targets the areas of greatest perceived need.

5. *Regulations as arbitrary and capricious.* The Teachers contend that the board acted in an arbitrary and capricious manner when it promulgated the challenged regulations because it failed to exercise its own statutory authority to oversee the teacher certification process. Instead, they assert, the board simply acquiesced in a gubernatorial "directive" to test math teachers.[12] The Teachers acknowledge that the board could take into account the Governor's public expressions of his educational policy views and give such views due weight. However, they argue that in adopting the regulations, the board abdicated its responsibility to exercise independent judgment and merely bowed to improper pressure from the Governor.

"If the regulations exceeded the [board's] statutory authority, then they would be arbitrary and capricious on their face in that they would by definition be unrelated to the achievement of any statutory goals." *American Family Life Assur. Co.* v. *Commissioner of Ins., supra* at 476. We have already concluded that promulgation of the regulations was well within the board's broad statutory authority to reform public education in this Commonwealth. Where statutory language clearly authorizes actions taken by an agency, the actions are wholly lawful, and we need not look behind them to determine the agency's

---

[12]In his State of the State address on January 29, 2000, Governor Cellucci stated that "[i]n those schools where more than thirty percent of students are failing mathematics, I am directing the Board of Education to test math teachers."

motives.[13] Cf. *Barnes* v. *Secretary of Admin.*, 411 Mass. 822, 827-828 (1992) (where constitutional amendment clearly authorized Governor's use of line item veto power, there is no inquiry into motives for his action); *Municipal Light Co. of Ashburnham* v. *Commonwealth*, 34 Mass. App. Ct. 162, 168, cert. denied, 510 U.S. 866 (1993) (where government officials acted in accordance with constitutional and statutory authority to promote public interest, alleged underlying motivations not relevant).

6. *Regulations as violating equal protection and due process rights.* The Teachers contend that the challenged regulations violate their equal protection and due process rights under the Fourteenth Amendment to the United States Constitution and arts. 1 and 10 of the Massachusetts Declaration of Rights. Their equal protection claim is based on the belief that it is irrational to treat mathematics teachers in communities where math MCAS scores are low differently from mathematics teachers in communities where math MCAS scores are high or from mathematics teachers in charter schools. This court's review of the Teachers' equal protection claim is the same under the Fourteenth Amendment as it is under the Massachusetts Declaration of Rights. See *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n*, 429 Mass. 721, 723 (1999); *Rushworth* v. *Registrar of Motor Vehicles*, 413 Mass. 265, 272 (1992). The Teachers do not assert that they are members of a suspect class or that the regulations have infringed on fundamental personal rights. Therefore, the regulations will be upheld as long as they are "rationally related to the furtherance of a legitimate State interest." *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n, supra* at 722. See *Dickerson* v. *Attorney Gen.*, 396 Mass. 740, 743 (1986). "A classification will be considered rationally related to a legitimate purpose 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control*

---

[13]In light of this conclusion, the extent to which the Governor or other members of the executive branch may or may not have influenced the board's promulgation of the challenged regulations need not be explored further through discovery, as suggested by the Teachers.

*Comm'n, supra* at 723, quoting *FCC* v. *Beach Communications, Inc.,* 508 U.S. 307, 313 (1993).

Distinctions between individuals made in the interests of practicality and administrative convenience are permissible and rational purposes for legislation. See *Murphy* v. *Department of Correction,* 429 Mass. 736, 740 (1999). "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Id.* at 741, quoting *Dandridge* v. *Williams,* 397 U.S. 471, 485 (1970). Some degree of overinclusiveness or underinclusiveness is constitutionally permissible in this regard. See *Murphy* v. *Department of Correction, supra* at 742. Moreover, the Legislature is permitted to "deal with problems 'one step at a time' . . . '[I]n confronting a multitude of evils, it may address itself to the phase of the problem most urgently requiring remedial action.' " *Opinion of the Justices,* 423 Mass. 1201, 1233 (1996), quoting *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U.S. 483, 489 (1955), and *Commonwealth* v. *McQuoid,* 369 Mass. 925, 927 (1976). See *Dandridge* v. *Williams, supra* at 487 (equal protection does not require State to "choose between attacking every aspect of a problem or not attacking the problem at all"); *Mobil Oil Corp.* v. *Attorney Gen.,* 361 Mass. 401, 417 (1972) ("The Legislature may proceed one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind").

As we have discussed, the challenged regulations are rationally related to the furtherance of a legitimate State interest in providing a high quality public education to every child of this Commonwealth. Assessment of the subject matter knowledge of mathematics teachers is a means for evaluating one possible underlying reason for poor student performance on the math MCAS test. To the extent that there may be gaps in teacher knowledge, such deficiencies can be addressed in professional development plans prior to relicensure. Similarly situated teachers are not being treated differently based on irrational criteria. It is permissible for the Legislature and, by extension, the board,

to focus its initial efforts aimed at scholastic improvement in one area of perceived academic weakness, namely math skills.

For the reasons just stated, the challenged regulations also do not violate the Teachers' due process rights under the Federal and State Constitutions. Their substantive due process claim is based on their contention that there is no rational connection between poor student performance on the math MCAS test and the subject matter knowledge of selected teachers. "The due process clause of the Fourteenth Amendment to the United States Constitution demands that a [regulation] bear a 'reasonable relation to a permissible legislative objective.' " *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing*, 379 Mass. 368, 373 (1979), quoting *Pinnick* v. *Cleary*, 360 Mass. 1, 14 (1971). "Under the cognate provisions of the Massachusetts Constitution, legislation must bear 'a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare.' "[14] *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n, supra* at 724, quoting *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing, supra.* The challenged regulations further plausible legislative objectives through reasonable means.

The Teachers contend that they had a right to present evidence to challenge the board's purported rational basis for the regulations. They assert that they would have demonstrated that student MCAS scores are driven, to an overwhelming degree, by socioeconomic factors and funding inequities, rather than by deficiencies in teacher subject matter knowledge. Even if the Teachers did present such evidence, it would not invalidate the

---

[14]Occasionally, when protected or fundamental rights have not been involved, this court has invalidated statutes solely for violating State due process standards. See, e.g., *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 421 (1965) (statute completely prohibited sale within Commonwealth of wholesome food product); *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418-419 (1940) (statute bore no relation to public health, safety, or morals). However, where the relationship between a statute and the public good is evident, we have concluded that any difference between the State and Federal due process standards is narrow and that the protection afforded by each will be deemed comparable. See *Rushworth* v. *Registrar of Motor Vehicles*, 413 Mass. 265, 269-270 (1992), and cases cited.

rational basis for assessment of teacher competency. In order to invalidate the regulations, the Teachers would need to show that deficiencies in teacher subject matter knowledge are never a reason for poor student performance on the MCAS, and they have not alleged this. The fact that socieconomic factors may play a significant role in student achievement of educational goals does not satisfy the Teachers' burden in challenging the validity of the regulations.

The Teachers' procedural due process claim is based on their contention that the challenged regulations are *impermissibly vague.* In particular, they point to 603 Code Mass. Regs. § 2.05 (5), which provides that "[t]he Commissioner may waive the Mathematics Content Assessment requirement for individual mathematics teachers based on a finding that such teachers have demonstrated mastery of mathematics or that special circumstances exist that make said assessment requirement inappropriate or immaterial." The Teachers contend that this provision fails to give them adequate notice of the assessment requirements and exemptions.

A vagueness challenge is usually raised in an effort to invalidate a criminal statute. See *Custody of a Minor (No. 2),* 378 Mass. 712, 716 (1979). See also *Opinions of the Justices,* 378 Mass. 822, 826 (1979) ("It is a central tenet of our constitutional law that, as a matter of due process, a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden should be deemed void for vagueness"). While civil laws are subject to judicial scrutiny for vagueness, see *Custody of a Minor (No. 2),* *supra* at 717, the degree of vagueness that is constitutionally permissible varies with the interests involved, see *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498-499 (1982). The test is less strict when the law involves the regulation of business and economic activity and does not inhibit the exercise of constitutionally protected rights. *Id.* See *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372, 378 (1982). Flexibility in a statute is necessary to respond to individual factual situations. *Custody of a Minor (No. 2),* *supra* at 719 (concluding that language of care and protection statute was not unconstitutionally vague and stating

that Legislature need not "anticipate and codify every parental shortcoming or handicap that might place an exposed child in danger"). Moreover, "[a]mbiguities, especially in regulations affecting business, may be clarified by resort to the administrative process so as to cure a vagueness claim." *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g, supra.*

The individual interests of teachers that may be affected by the challenged regulations are economic in nature, namely the conditions on the right to practice their profession. The regulations do not forbid any behavior by teachers. They merely set forth the requirements for when a teacher must take the assessment test and provide that, in certain circumstances, the test may be waived. The provisions of 603 Code Mass. Regs. § 2.05, and the statutes that gave the board the authority to promulgate it, clearly inform teachers of their professional responsibilities and obligations. Cf. *Gurry* v. *Board of Pub. Accountancy*, 394 Mass. 118, 127-128 (1985) (regulation allowing license suspension for act "discreditable" to public accounting profession upheld against vagueness challenge where board fairly exercised statutorily granted regulatory power and did not impose criminal sanction). Whether a waiver of the assessment test is appropriate in a particular circumstance is best left to the commissioner to decide on a case-by-case basis. See *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g, supra* at 379. Accordingly, we conclude that the Teachers' vagueness claim is without merit.

7. *Regulations as violating collective bargaining law*. The Teachers contend that the challenged regulations conflict with the public sector collective bargaining law, see G. L. c. 150E, and with provisions of the Act requiring collective bargaining over teacher performance evaluations, see G. L. c. 71, § 38. They assert that evaluations constitute a " 'term and condition' of employment" and, as such, are a local matter within the control of individual school districts and are a mandatory subject of bargaining. Therefore, the board cannot unilaterally require that teachers take the assessment test.

Pursuant to G. L. c. 150E, § 6, public employers and employees "shall negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other

terms and conditions of employment." The focus of the collective bargaining law is the employment relationship between teachers and their school districts. One aspect of this relationship is regular teacher evaluations. Pursuant to G. L. c. 71, § 38, "[t]he superintendent, by means of comprehensive evaluation, shall cause the performance of all teachers . . . within the school district to be evaluated using any principles of evaluation established by the board of education pursuant to [G. L. c. 69, § 1B,] and by such consistent, supplemental performance standards as the school committee may require . . . . The superintendent shall require the evaluation of . . . teachers without professional teacher status every year and shall require the evaluation of teachers with professional teacher status at least once every two years. The procedures for conducting such evaluations, but not the requirement for such evaluations, shall be subject to the collective bargaining provisions of [G. L. c. 150E]." The employment relationship between teachers and their school districts, however, is not what is at issue here.

The challenged regulations govern teacher recertification which relates to the relationship between individual teachers and the Commonwealth. The renewal of a teacher's license by the commissioner simply is not a "local matter" that falls within the province of individual school districts. Cf. *Nicholas B.* v. *School Comm. of Worcester*, 412 Mass. 20, 21 (1992) ("School committees have wide discretion in school discipline matters"). Before one is eligible for employment as a teacher, the commissioner must grant that person a provisional or standard certificate[15] relating to the type of position for which employment is sought. See G. L. c. 71, § 38G, twenty-ninth par. "Each standard educator certificate shall be valid for five years and continued every five years thereafter upon the successful

---

[15]A "provisional educator certificate" is defined as "a license to teach issued to a person who has successfully met the preparation and eligibility requirements as established by the board. The provisional educator's certificate shall be valid for five years of employment as an educator in the schools of the commonwealth." G. L. c. 71, § 38G, fifth par. A "standard educator certificate" is defined as "a license to teach issued to a person who has successfully met the preparation and eligibility requirements as established by the board. The standard educator's certificate shall be valid for renewable terms of five years." G. L. c. 71, § 38G, tenth par.

completion of an individual professional development plan that meets the subject matter knowledge and teaching skill requirements *set by the board*" (emphasis added). G. L. c. 71, § 38G, twenty-second par. Only after a person has become properly licensed (and later recertified) by the Commonwealth will that person be eligible for employment as a teacher in a local school district. Once hired, the teacher's "terms and conditions of employment," including regular evaluations every year or two, are subject to the collective bargaining provisions of G. L. c. 150E. Contrary to the Teachers' arguments, we conclude that there is no conflict between the challenged regulations, which govern State teacher recertification, and collective bargaining law, which governs specific terms and conditions of employment.[16]

*Judgment affirmed.*

---

[16]In his memorandum of decision, the Superior Court judge noted that G. L. c. 150E, § 7 (*d*), provides that if a collective bargaining agreement conflicts with a statute or regulation, the terms of the collective bargaining agreement will prevail if the statute or regulation is listed in § 7 (*d*). A collective bargaining agreement has not been submitted to the court. In any event, G. L. c. 69, G. L. c. 71, and 603 Code Mass. Regs. §§ 2.01, 2.02, 2.05, 44.02, 44.03, 44.04, are not listed in G. L. c. 150E, § 7 (*d*).