APPEALS COURT 
 
 SPRINGFIELD WATER AND SEWER COMMISSION & others[1] vs. DEPARTMENT OF ENVIRONMENTAL PROTECTION & another[2]

 
 Docket:
 24-P-931
 
 
 Dates:
 April 14, 2025 – July 31, 2025
 
 
 Present:
 Blake, C.J., Shin, & Walsh, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Municipal Corporations, Water supply, Water commissioners. Water. Regulation. Department of Environmental Protection. Administrative Law, Agency's interpretation of regulation, Rulemaking. Practice, Civil, Judgment on the pleadings.
 
 

       Civil action commenced in the Superior Court Department on February 17, 2023. 
      The case was heard by Catherine H. Ham, J., on motions for judgment on the pleadings. 
      Peter F. Durning for the plaintiffs.
      Louis M. Dundin, Assistant Attorney General, for the defendant.
      Harley C. Racer for the intervener.
      Kevin Cassidy, for Massachusetts Rivers Alliance, Inc., & others, amici curiae, submitted a brief.
      SHIN, J.  In 2023, after an extensive rulemaking proceeding, the Department of Environmental Protection (department) promulgated amendments to its regulations implementing the Massachusetts Water Management Act, G. L. c. 21G (act).  The Legislature passed the act in 1985 for the purpose of promoting better water management and water conservation in the Commonwealth.  See Concord v. Water Dep't of Littleton, 487 Mass. 56, 58 (2021); Water Dep't of Fairhaven v. Department of Envtl. Protection, 455 Mass. 740, 745-747 (2010) (Fairhaven).  To that end, the act imposes a "withdrawal volume threshold" of 100,000 gallons per day, prohibiting water suppliers from making a withdrawal from a water source in excess of that amount without either (a) obtaining a permit from the department or (b) filing a registration statement with the department.  G. L. c. 21G, § 4.  The latter path, withdrawal by registration, is available only to suppliers that had existing rights to withdraw more than the threshold volume as of the act's effective date.  The act allowed any such supplier to preserve its existing rights by filing a registration statement by January 1, 1988; the registration statement, if timely renewed, then allows the supplier to "continue forever to withdraw water at the rate of its existing withdrawal."  Fairhaven, supra at 742.  See G. L. c. 21G, § 5.
      At issue in this case is a provision in the amended regulations that requires registrants to "establish enforceable restrictions limiting nonessential outdoor water use" during periods of drought.  310 Code Mass. Regs. § 36.07(2)(c) (2023) (§ 36.07[2][c]).[3]  Claiming that this requirement infringes on their rights to existing withdrawals and is arbitrary and capricious, the plaintiffs -- a group of water suppliers holding registrations under the act and a trade association -- filed a complaint for judicial review under G. L. c. 30A, § 7.  On the parties' cross motions, a Superior Court judge granted judgment on the pleadings for the department and the defendant intervener, Charles River Watershed Association.  In a comprehensive memorandum of decision, the judge concluded that § 36.07(2)(c) restricts water use, not water withdrawals, and thus does not infringe on the plaintiffs' existing rights, and that the plaintiffs failed to meet their burden of showing that § 36.07(2)(c) is otherwise arbitrary and capricious.  We agree and thus affirm.[4]
      Background.  1.  Statutory framework.  The act was prompted by "calls for action issued by two separate studies, one commissioned by the executive branch and the other by the Legislature," which stressed the need for a "comprehensive approach to water conservation in the Commonwealth."  Fairhaven, 455 Mass. at 745.  The act requires the department and the water resources commission (commission) of the Executive Office of Energy and Environmental Affairs (EEA) to "cooperate in the planning, establishment and management of programs to assess the uses of water in the commonwealth and to plan for future needs."  G. L. c. 21G, § 3.  The commission's mandate is to "adopt principles, policies and guidelines necessary for the effective planning and management of water use and conservation in the commonwealth and for the administration of [the act] as necessary and proper to ensure an adequate volume and quality of water for all citizens of the commonwealth, both present and future."  Id.  The department's mandate is to promulgate "regulations as it deems necessary to carry out the purposes of [the act], establishing a mechanism for managing ground and surface water in the commonwealth as a single hydrological system and ensuring, where necessary, a balance among competing water withdrawals and uses."  Id.  As is evident from the statutory text and legislative history, "water management, including water conservation, is an important purpose of the [a]ct, and the department . . . has broad authority to issue regulations to carry out this purpose."  Fairhaven, supra at 746-747.
      As mentioned, any supplier that had existing withdrawal rights in excess of the 100,000-gallon volume threshold and that had filed a registration statement by January 1, 1988, is entitled to continue to withdraw water at the rate of its existing withdrawals so long as it timely renews its registration statement.  This entitlement is established by G. L. c. 21G, § 5, which states that "[a]ll initial registration statements filed [by January 1, 1988,] for existing withdrawals from the water source shall authorize such withdrawals until the next applicable expiration date . . . " and "[u]pon the expiration of any initial or renewal registration statement under this section, the registrant shall be entitled, upon the filing of a renewal registration statement, to continue existing withdrawals specified in the registration statement for a period of ten years."  The department may not restrict a registrant's existing withdrawals with one exception.  That is, on the petition of an "operator of a public water system," the department may declare "a state of water emergency," G. L. c. 21G, § 15, which then empowers it to "[d]irect any person to reduce, by a specified volume, the withdrawal or use of any water; or to cease the withdrawal or use of any water."  G. L. c. 21G, § 17 (3).  See Fairhaven, 455 Mass. at 742 n.4.
      In contrast to registrants, suppliers without existing withdrawal rights must obtain a permit from the department to withdraw water in excess of the 100,000-gallon volume threshold.  See G. L. c. 21G, § 7.  The department has broad discretion to issue or deny permits based on factors such as "the impact of the proposed withdrawal on other hydrologically interconnected water sources, the water available within the proposed water source's safe yield, and '[r]easonable conservation practices and measures, consistent with efficient utilization of the water.'"  Fairhaven, 455 Mass. at 748, quoting G. L. c. 21G, § 7.  The department may also "attach to any permit whatever conditions it deems necessary to further the purposes of [the act] or to assure compliance with its regulations."  G. L. c. 21G, § 11.
      2.  The amended regulations.  Section 36.07(2)(c) of the amended regulations authorizes the department to impose new conditions on registration statements, including the requirement that registrants establish enforceable restrictions on "nonessential outdoor water use" during droughts declared by the Secretary of EEA (secretary).  Elsewhere in the regulations, "Nonessential Outdoor Water Use" is defined in the negative as "a use that is not required:
"(a) for health or safety reasons, including public facilities used for cooling such as splash pads and swimming pools, and for washing of boats, engines, or marine equipment to prevent negative saltwater impacts or the transfer of invasive aquatic species;
"(b) by permit, license, statute or regulation;
"(c) for the production of food, including vegetable gardens, and fiber;
"(d) for the maintenance of livestock;
"(e) to meet the core functions . . . of a business . . .;[5]
"(f) for irrigation of public parks before 9:00 A.M. and after 5:00 P.M.;
"(g) for irrigation of public and private recreation fields . . . before 9:00 A.M. and after 5:00 P.M.;
"(h) for irrigation of publicly-funded shade trees and trees in the public right-of-way; or
"(i) to establish a new lawn as necessary to stabilize soil in response to new construction or following the repair or replacement of a Title 5 system."
310 Code Mass. Regs. § 36.03.
      The extent of the use restrictions varies depending on the severity of the drought.  In a "Level 1" or "Mild Drought," nonessential outdoor water uses are "restricted to no more than one day per week, before 9:00 A.M. and after 5:00 P.M.," but "watering of ornamentals and flower gardens with drip irrigation, hand-held hose or watering cans may be permitted."  310 Code Mass. Regs. § 36.07(2)(c)(1)(a).  In a "Level 2" or "Significant Drought," "[a]ll nonessential outdoor water uses [are] banned" except for "watering of ornamentals and flower gardens with drip irrigation, hand-held hose or watering cans."  310 Code Mass. Regs. § 36.07(2)(c)(1)(b).  In a "Level 3" or "Critical Drought," or in a "Level 4 (Drought Emergency)," "[a]ll nonessential outdoor water uses are banned."  310 Code Mass. Regs. § 36.07(2)(c)(1)(c).
      While registrants may apply for a variance from the use restrictions, this is available only to registrants that withdraw water exclusively "from surface water supplies with Multi-Year Drought Storage."  310 Code Mass. Regs. § 36.07(2)(c)(3).  "Multi-Year Drought Storage" is defined as "a registrant's reservoir capacity, as determined by the [d]epartment, of not less than two times the sum of a registrant's authorized withdrawal and any required reservoir release established by statute, regulation, permit or other approval issued by a state or federal agency."  310 Code Mass. Regs. § 36.03.  In other words, to qualify for a variance, a registrant must have surface water supplies in reserve equal to two years' worth of its authorized withdrawals plus any required reservoir release.  Qualifying registrants "may implement nonessential outdoor water use restrictions in accordance with an accepted drought management plan instead of the restrictions described in 310 [Code Mass. Regs. §] 36.07(2)(c)1."  310 Code Mass. Regs. § 36.07(2)(c)(3).  The department will approve drought management plans that "establish nonessential outdoor use restrictions that are sufficiently protective of public health and safety, reservoir capacity, and any required releases" and that meet certain additional specified criteria.  Id. 
      Discussion.  1.  Standard of review.  "A highly deferential standard of review governs a facial challenge to regulations promulgated by a government agency."  Massachusetts Fed'n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 771 (2002).  "[A] properly promulgated regulation has the force of law . . . and must be accorded all the deference due to a statute."  Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 723, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936 (1983).  A party raising a facial challenge therefore has the heavy burden of showing "the absence of any conceivable ground upon which [the regulation] may be upheld."  Id. at 722, quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 776 (1980).  In determining whether a party has met this burden, we "must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate."  Borden, Inc., supra at 723, quoting American Family Life Assur. Co. v. Commissioner of Ins., 388 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983).  Judicial deference to the agency's judgment "is especially appropriate where, as here, the statute[] in question involve[s] an explicit, broad grant of rule-making authority."  Goldberg v. Board of Health of Granby, 444 Mass. 627, 634 (2005).
      We review the judge's decision allowing the defendants' motion for judgment on the pleadings de novo.  See Hovagimian v. Concert Blue Hill, LLC, 488 Mass. 237, 240 (2021). 
      2.  Whether § 36.07(2)(c) conflicts with the act.  The plaintiffs' primary argument on appeal is that the condition in § 36.07(2)(c) requiring enforceable restrictions on nonessential outdoor water use is ultra vires because it denies registrants their entitlement to existing withdrawals.  As their argument goes, "[t]he [p]laintiffs withdraw the water that supplies their customers' water use"; "[b]y enforcing water use restrictions against their own customers, the [p]laintiffs force them to use less water than they otherwise would be entitled to use"; "[a]s such, the new condition places an artificial limit on the amount of water the [p]laintiffs can withdraw when a drought is declared"; and this effectively denies the plaintiffs "the ability to withdraw water they are otherwise entitled to."  We are unpersuaded for several reasons.
      Most fundamentally, under the plain language of the act, the right guaranteed to the plaintiffs is to "withdraw[]" water in the amount of their "existing withdrawals," G. L. c. 21G, § 5, and § 36.07(2)(c), on its face, does not infringe on that right.  The act defines "[w]ithdrawal" as "the removal or taking of water from a water source."  G. L. c. 21G, § 2.  Nothing in the amended regulations prevents registrants from continuing to remove or take water up to their registered volume.  Even were § 36.07(2)(c)'s restrictions on nonessential outdoor water use to reduce customer demand during periods of drought, registrants could still take as much water as they are entitled to and use it in other permissible ways.[6]  Section 36.07(2)(c), in other words, is a regulation of use, not withdrawals.  And as such, it falls squarely within the department's delegated authority to "manag[e] ground and surface water in the commonwealth as a single hydrological system and ensur[e], where necessary, a balance among competing water withdrawals and uses."  G. L. c. 21G, § 3.  See Fairhaven, 455 Mass. at 746-747 (department has broad authority to issue regulations to carry out act's purpose of water conservation).  Cf. Entergy Nuclear Generation Co. v. Department of Envtl. Protection, 459 Mass. 319, 320, 331-332 (2011) (department's broad authority under State Clean Waters Act to protect quality of water resources reasonably extended to regulation of industrial facilities withdrawing water from surface waterbodies).
      The plaintiffs' suggestion that the department may not impose any use restrictions on their customers is also inconsistent with Fairhaven, 455 Mass. at 748, which held that the department, "by regulation, may impose conservation measures on all water users, including registrants," so long as it does "not deny registrants their entitlement to existing withdrawals."  The conservation measures at issue in Fairhaven included conditions that "each registrant's water consumption is to be limited to sixty-five residential gallons per capita per day" and that registrants "adhere[] to the department's seasonal demand management plan . . . , which restricts outdoor water use from May through September when the drought level is above normal."  Id. at 743.  While ultimately invalidating the conditions on the ground that the department could impose them "only through the adoption of regulations," id. at 749, the court noted that the conditions "restrict[ed] the manner in which water is used" and did not "decrease the registrants' total water usage below the existing withdrawals to which they are entitled."  Id. at 743.  Likewise, here, the conditions imposed by § 36.07(2)(c) -- which are less stringent than those in Fairhaven -- permissibly regulate water use without infringing on the plaintiffs' rights to existing withdrawals.
      Finally, the plaintiffs' reading of the act would contravene its purpose of promoting better water management and water conservation.  According to information submitted during the rulemaking proceeding, Statewide in 2019, approximately fifty-three percent of public water was allocated by registration and approximately forty-seven percent by permit.  Thus, if the plaintiffs' reading is correct, the department would be prohibited, even during periods of critical drought or drought emergencies, from imposing any meaningful conservation measures on a large segment of water users in the Commonwealth because they happen to have their water supplied by a registrant, as opposed to a permittee.[7]  This would directly contradict the act's purpose to manage and conserve water use so as "to plan for future water needs," "protect the natural environment of the water," and "ensure an adequate volume and quality of water for all citizens of the commonwealth, both present and future."  G. L. c. 21G, § 3.  We decline to construe the act in a way that would upend the very purpose for which it was enacted.  See Entergy Nuclear Generation Co., 459 Mass. at 329 ("A statute must be interpreted in such a way as to effectuate the legislative intent underlying its enactment").
      For all of these reasons, we conclude that the plaintiffs have failed to meet their heavy burden of showing that § 36.07(2)(c) is ultra vires.  We note that, if going forward a registrant believes that § 36.07(2)(c) has the effect of infringing on its right to existing withdrawals, the amended regulations provide an adjudicatory process through which the registrant can raise such a claim.  See 310 Code Mass. Regs. § 36.37.  See also Fairhaven, 455 Mass. at 750 n.12 ("if the department were to issue regulations requiring registrants to comply with the same conservation measures at issue here, it would further the purposes of the [a]ct to provide an agency adjudicatory process to resolve a registrant's claim that the conditions were so severe that they effectively denied the registrant its entitlement to existing withdrawals").  No as-applied claim is before us, however, so we have no occasion to reach the question.[8]
      3.  Whether § 36.07(2)(c) is arbitrary and capricious.  The plaintiffs contend that § 36.07(2)(c) is arbitrary and capricious for a number of reasons.  In assessing these arguments, we do not "sit and weigh conflicting evidence supporting or opposing" the regulation.  Borden, Inc., 388 Mass. at 723, quoting Shell Oil Co. v. Revere, 383 Mass. 682, 687 (1981).  Again, our role is to determine only whether there is "any conceivable ground upon which [the regulation] may be upheld."  Borden Inc., supra at 722, quoting Purity Supreme, Inc., 380 Mass. at 776.  The plaintiffs' arguments all fail under this standard.
      The plaintiffs first contend that the variance available to registrants that withdraw "from surface water supplies with Multi-Year Drought Storage" arbitrarily discriminates against registrants with smaller reservoir capacities and those that withdraw from groundwater sources.  310 Code Mass. Regs. § 36.07(2)(c)(3).  To the contrary, however, the department could rationally conclude that limiting the variance to registrants having a certain amount of reservoir capacity is necessary to protect the availability of the water supply during droughts.[9]  The department could also rationally limit the variance to registrants withdrawing water solely from surface water supplies.  The administrative record demonstrates that, in making this determination, the department considered the differences between the environmental effects of withdrawing from surface water sources versus groundwater sources.[10]  The plaintiffs' assertion that the department disregarded other factors relevant to drought management planning asks us to reweigh the evidence that was before the department, which is not our role.  See Borden, Inc., 388 Mass. at 723.
      The plaintiffs also appear to argue that § 36.07(2)(c) is facially discriminatory because it places conditions on registrations that are more stringent than the standard conditions on permits.  The plaintiffs raise this argument in summary fashion, and the record citations they provide do not shed light on whether the requirements for registrants are overall more stringent than those for permittees.  As we have mentioned, the department has the discretion to "attach to any permit whatever conditions it deems necessary to further the purposes of [the act] or to assure compliance with its regulations."  G. L. c. 21G, § 11.  Because the argument is undeveloped, we need not address it further, see Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).
      Next, the plaintiffs claim that § 36.07(2)(c) is arbitrary and capricious because the secretary might make drought declarations by drought regions, which "do not align with the major river basins in Massachusetts," and this could potentially trigger use restrictions in areas not actually under drought conditions.  But the secretary is authorized to declare droughts by drought region, county, or watershed, and EEA's drought management plan states that drought "regions may be adjusted based on the particular conditions of the drought."  See 310 Code Mass. Regs. § 36.07(2)(c)(1) (restrictions on nonessential outdoor water use "shall be in place during a drought declaration by the Secretary for the drought region, county or watershed where the registrant's withdrawals are located").  The plaintiffs' unfounded speculation that the secretary might act irrationally does not demonstrate arbitrary and capricious agency action.
      Also speculative is the plaintiffs' assertion that some registrants may not be able to enforce water use restrictions because they are dependent on "local political processes outside their control."  Again, the plaintiffs make this argument in summary fashion, with no supporting citations, and they ignore information in the administrative record that "many permittees have successfully navigated [restrictions on nonessential outdoor water use] for years."  The argument is thus waived.  See Mass. R. A. P. 16 (a) (9) (A).
      The plaintiffs' final two claims -- that the use restrictions will increase "the water age within their water systems" and thereby require additional system flushing, and that the costs of the restrictions outweigh any long-term benefits -- were considered and addressed by the department during the rulemaking proceeding.  The plaintiffs have not explained why the department's weighing of the evidence was arbitrary and capricious or why there is no conceivable basis on which the regulation can be upheld.  We must therefore defer to the department's judgment.  See Goldberg, 444 Mass. at 633-634; Borden, Inc., 388 Mass. at 722-724.
Judgment affirmed.
footnotes

      [1]Fall River water department, Salem and Beverly water supply board, Lynn water and sewer commission, Monson water and sewer commission, Southbridge water department, North Raynham water district, Manchester water department, Pepperell water department, Wilmington water department, Three Rivers fire district, Amherst water department, South Hadley fire district no. 2 water department, Middleborough water supply, Natick water department, Mattapoisett River Valley water district commission, Holyoke water works, water division of Wellesley department of public works, Needham department of public works, and Massachusetts Coalition for Water Resources Stewardship.
      [2] Charles River Watershed Association, intervener.
      [3] All citations to 310 Code Mass. Regs. §§ 36.00 in this opinion are to the 2023 amendments.
      [4] We acknowledge the amicus brief in support of the defendant and the defendant intervener submitted jointly by the Massachusetts Rivers Alliance, Inc.; the Ipswich River Watershed Association, Inc.; the Parker River Clean Water Association, Inc.; the Massachusetts Audubon Society, Inc.; the Neponset River Watershed Association, Inc.; the Taunton River Watershed Alliance, Inc.; the Connecticut River Conservancy; OARS 3 Rivers; the Jones River Watershed Association, Inc.; Clean Water Action; and the North and South Rivers Watershed Association, Inc.
      [5] Among the examples provided are "golf courses as necessary to maintain greens and tees, and limited fairway watering."  310 Code Mass. Regs. § 36.03.
      [6] As the plaintiffs state in their brief, some registrants, including some of the plaintiffs, supply water to other municipalities or to other States.  The defendants agree that the plaintiffs could store the water they withdraw or sell or transfer it to another location.
      [7] The plaintiffs resist this conclusion by arguing that the department has other means to promote water conservation, "such as requiring registrants to conduct water audits, detect and repair water system leaks, upgrade system infrastructure, or provide customer outreach and education on, for example, water-efficient appliances or drought-tolerant plantings or rain barrels."  None of these are meaningful measures to conserve water specifically during periods of drought.
      [8] We also need not reach the plaintiffs' argument that § 36.07(2)(c) is ultra vires because the act allows the department to restrict existing withdrawals only in "a state of water emergency" declared under the procedures of G. L. c. 21G, § 15.  This argument is derivative of the plaintiffs' main argument, which we have rejected, that § 36.07(2)(c) infringes on their entitlement to existing withdrawals.
      [9] The plaintiffs' claim that it was arbitrary for the department to draw the line at two years of reserve capacity, as opposed to three years, is raised for the first time in their reply brief and is therefore waived.  See Commonwealth v. Stewart, 460 Mass. 817, 831 (2011).
      [10] For example, the department considered the "fact that very large surface water supplies . . . will not impact streamflow during droughts by reducing baseflow as do groundwater sources."